PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

_____

THE WILDERNESS SOCIETY;
SOUTHERN UTAH WILDERNESS
ALLIANCE,

     Plaintiffs - Appellees,

v.

KANE COUNTY, UTAH; DANIEL
W. HULET, MARK W.
HABBESHAW, AND DUKE COX, in
their official capacities as Kane
County Commissioners,

     Defendants - Appellants.

------------------------

UTAH ASSOCIATION OF
COUNTIES; NATIONAL TRUST
FOR HISTORIC PRESERVATION;
PATRICK A. SHEA, MICHAEL P.
DOMBECK, JAMES BACA, Former
Directors of the Bureau of Land
Management; NATURAL
RESOURCES AND PUBLIC LANDS
LAW PROFESSORS; STATE OF
UTAH; SIERRA CLUB; NATIONAL
PARKS CONSERVATION
ASSOCIATION; NATIONAL
SENIOR CITIZENS LAW CENTER,
AARP, AND NATIONAL HEALTH
LAW PROGRAM,

     Amici Curiae.

No. 08-4090

Michael S. Lee, Howrey LLP, Salt Lake City, Utah (Thomas R. Lee, Provo, Utah, Shawn T. Welch and Kendra Shirey, Holme Roberts & Owen LLP, Salt Lake City, Utah, with him on the briefs), for the Appellants.

James S. Angell, Earthjustice, Denver, Colorado (Edward B. Zukoski, Earthjustice, Denver, Colorado, and Heidi J. McIntosh, Stephen H.M. Bloch, Southern Utah Wilderness Alliance, Salt Lake City, Utah, with him on the briefs), for the Appellees.

Michael S. Lee, Howrey LLP, and Thomas R. Lee, Provo, Utah, filed a brief on behalf of Amicus Curiae, Utah Association of Counties.

Elizabeth S. Merritt, Michael D. Smith, Alexander Hays, V., National Trust for Historic Preservation in the United States, Washington, D.C., filed a brief on behalf of Amicus Curiae, National Trust for Historic Preservation.

W. Cullen Battle, Fabian & Clendenin, Salt Lake City, Utah, filed a brief on behalf of Amicus Curiae, Patrick A. Shea, James Baca, and Michael P. Dombeck, Former Directors of the Bureau of Land Management.

Sarah Krakoff, University of Colorado Law School, filed a brief on behalf of the following Amicus Curiae Natural Resources and Public Lands Law Professors; Robert W. Adler, University of Utah, S.J. Quinney College of Law, Eric Biber, University of California, Berkeley, Bret C. Birdsong, William S. Boyd School of Law, University of Nevada, Las Vegas, Michael C. Blumm, Lewis and Clark Law School, Joe Feller, Arizona State University, Dale Goble, University of Idaho, Robert B. Keiter, University of Utah, S.J. Quinney College of Law, Christine A. Klein, University of Florida Levin College of Law, Amanda C. Leiter, The Catholic University of America, Columbus School of Law, John D. Leshy, University of California, Hastings College of Law, James R. Ray, University of Colorado Law School, Mark Squillace, University of Colorado Law School,

Charles Wilkinson, University of Colorado Law School, and Sandra Zeller, University of Nebraska College of Law.

Harry Souvall, Assistant Utah Attorney General, (Mark L. Shurtleff, Utah Attorney General with him of the brief) filed a brief on behalf of Amicus Curiae State of Utah.

Eric E. Huber, Boulder, Colorado, filed a brief on behalf of Amicus Curiae Sierra Club.

W. Cullen Battle, Fabian & Clendenin, Salt Lake City, Utah filed a brief on behalf of Amicus Curiae National Parks Conservation Association.

Rochelle Bobroff, Herbert Semmel Federal Rights Project, filed a brief on behalf of Amicus Curiae National Senior Citizens Law Center, AARP, and National Health Law Program.

---

Before **BRISCOE**, Chief Circuit Judge, **HOLLOWAY**, **TACHA**, **KELLY**, **LUCERO**, **MURPHY**, **HARTZ**, **O'BRIEN**, **TYMKOVICH**, **GORSUCH**, **HOLMES** and **MATHESON**[*], Circuit Judges.

---

**KELLY**, Circuit Judge, joined by **TACHA**, **MURPHY**, **HARTZ**, **TYMKOVICH**, and **HOLMES**, Circuit Judges.

---

We granted rehearing en banc to consider several issues in this suit

---

[*] The Honorable Scott M. Matheson, Jr., was sworn in officially on December 30, 2010. He did not, however, participate in the court's review of this matter.

challenging a local government's rights of way over federal lands in southern Utah. The Wilderness Society and other environmental groups (collectively "TWS") brought this action challenging Kane County's assertion of R.S. 2477 rights of way over federal lands managed by the Bureau of Land Management and the National Park Service. TWS sued under the Supremacy Clause of the U.S. Constitution, alleging that federal statutes, regulations, and agency management decisions preempted Kane County's actions. The district court granted TWS's motion for summary judgment, holding that Kane County must first establish the validity of its R.S. 2477 rights in a separate action and, until it did so, federal law preempted any ordinances and actions to assert those rights. The district court also enjoined Kane County from any action to open routes over federal lands to public use.

A divided panel affirmed the district court. See Wilderness Soc'y v. Kane County, 581 F.3d 1198 (10th Cir. 2009). According to the panel: (1) TWS demonstrated constitutional and prudential standing; (2) the matter was not moot; (3) TWS had a cause of action under the Supremacy Clause; (4) the State of Utah and the United States were not necessary parties; and (5) the district court correctly decided the merits of the preemption claims. Id. at 1209-26.

We reverse because TWS lacks prudential standing to sue. The general prohibition against third-party standing applies to a Supremacy Clause challenge where TWS seeks to vindicate the property rights of the federal government, and

no countervailing factors exist here which might permit standing.

## Background

1. R.S. 2477 Rights of Way

This case is the latest stage in years of litigation over road rights on federal lands in southern Utah. Norton v. S. Utah Wilderness Alliance, 542 U.S. 55 (2004); Kane County v. United States, 597 F.3d 1129 (10th Cir. 2010); Kane County v. Salazar, 562 F.3d 1077 (10th Cir. 2009); San Juan County v. United States, 503 F.3d 1163 (10th Cir. 2007) (en banc); Utah Shared Access Alliance v. Carpenter, 463 F.3d 1125 (10th Cir. 2006); S. Utah Wilderness Alliance v. Bureau of Land Mgmt., 425 F.3d 735 (10th Cir. 2005) ("SUWA"); Sierra Club v. Lujan, 949 F.2d 362 (10th Cir. 1991); Sierra Club v. Hodel, 848 F.2d 1068 (10th Cir. 1988). Like most of those cases, this one concerns the nature of Congress's grant of a "right of way for the construction of highways over public lands, not reserved for public uses." Act of July 26, 1866, ch. 262, § 8, 14 Stat. 251, 253, *codified at* 43 U.S.C. § 932, *repealed by* Federal Land Policy and Management Act of 1976 ("FLPMA"), Pub. L. No. 94-579, § 706(a), 90 Stat. 2743. Known as "R.S. 2477," this statute and the roads established under its authority "were an integral part of the congressional pro-development lands policy." SUWA, 425 F.3d at 741.

The establishment of these rights of way "required no administrative formalities: no entry, no application, no license, no patent, and no deed on the

5

federal side; no formal act of public acceptance on the part of the states or localities in whom the right was vested." Id. Indeed, "R.S. 2477 was a standing offer of a free right of way over the public domain," the acceptance of which occurred "without formal action by public authorities." Id. (internal citations and quotation marks omitted). "All that is required" for title to pass "are acts on the part of the grantee sufficient to manifest an intent to accept the congressional offer." Id. at 754; see also San Juan County, 503 F.3d at 1168 ("'[A] right of way could be obtained without application to, or approval by, the federal government. Rather, the grant referred to in R.S. 2477 became effective upon the construction or establishing of highways, in accordance with the state laws.'" (quoting Hodel, 848 F.2d at 1078)). Although FLPMA repealed R.S. 2477 in 1976, it expressly preserved any existing rights-of-way. Pub. L. No. 94-579, § 701(a), 90 Stat. 2743, 2786 ("Nothing in this Act . . . shall be construed as terminating any valid lease, permit, patent, right-of-way, or other land use right or authorization existing on the date of approval of this act."); § 701(h), 90 Stat. 2743, 2786 ("All actions by the Secretary concerned under this Act shall be subject to valid existing rights.").

    2.    Kane County's Actions

The events relevant to this case began in March 2003, when Kane County requested that BLM remove its road signs closing certain routes in the Grand Staircase-Escalante National Monument. Aplt. App. 848-51. The BLM's

6

management plan for the Monument closed many routes to off-highway vehicles such as all-terrain vehicles, snowmobiles, and the like. See id. at 2856. The management plan depicted the open routes on a map labeled "Map 2," but provided that "[a]ny route not shown on Map 2 is considered closed upon approval of this plan, subject to valid existing rights." Id. at 1624, 1628. The plan contemplated the assertion of R.S. 2477 rights in the Monument:

> If claims are determined to be valid R.S. 2477 highways, the Approved Plan will respect those as valid existing rights. . . . Nothing in this Plan alters in any way any legal rights the Counties of Garfield and Kane or the State of Utah has [sic] to assert and protect R.S. 2477 rights, and to challenge in Federal court or other appropriate venue any BLM road closures that they believe are inconsistent with their rights.

Id. at 1624 & n.1. The County's March 2003 letter asserted that the BLM had wrongfully closed "county roads asserted as R.S. 2477 Rights-of-Way." Id. at 848. The County proposed some temporary solutions, but the BLM would not remove the signs. Id. at 850, 853.

In August 2003, the County removed thirty-one BLM signs from alleged R.S. 2477 rights of way, returned the signs to BLM, and wrote BLM a letter detailing its actions. Id. at 853-54. In 2005, the County posted its own signs along routes in the Monument that the County understood to be county roads. Id. at 756-57, 921. The signs indicated that the routes were open to off-highway vehicle use despite the management plan. Id. at 1635-36. The County later removed "some" of these signs "pending consideration of the roads' status and

7

uses." Id. at 929. In August 2005, the County adopted Ordinance No. 2005-03, which opened Class B and Class D county roads to off-highway vehicle use. Id. at 1755. The Ordinance invoked the County's R.S. 2477 rights, but did not refer to any federal lands. Id. The County later admitted that the ordinance applied to rights of way crossing federal lands, specifically the Monument, the Moquith Mountain Wilderness Study Area, the Paria Canyon-Vermillion Cliffs Wilderness Area, and the Glen Canyon National Recreation Area. Id. at 1636-37, 2396, 2398. The County rescinded the ordinance in December 2006, after the start of this litigation. Id. at 836. At the same time, the County declared its intention to remove the off-highway vehicle use decals from all county roads. Id. at 836, 839. The County reported that it later removed all the decals. Id. at 917.

3.    Procedural History

TWS filed this suit on October 13, 2005, alleging that the County's ordinance, removal of BLM signs, and erection of County signs conflicted with federal statutes, regulations, and decisions and orders issued pursuant to those regulations. Id. at 18-20. TWS sought declarations that the ordinance and the County's posting of signs on federal land were unconstitutional, and an injunction against similar actions in the future. Id. at 20-21.

Kane County moved to dismiss the suit in January 2006 under Rules 12(b)(1), (6) and (7). The County argued against the court's jurisdiction on several grounds, including TWS's lack of constitutional or prudential standing.

8

Id. at 118-27. In particular, the County argued that TWS had no "standing to sue in lieu of the United States" and was not pursuing its "own legal rights," but rather "seek[ing] to stand in for the United States." Id. at 122. The district court denied the County's motion in August 2006, finding that TWS had shown constitutional standing. Id. at 568. With respect to prudential standing, however, the court reasoned that "TWS need not show prudential standing" because it invoked the Supremacy Clause. Id. at 569-70. At the same time, the court granted TWS's motion to amend its complaint. Id. at 570-71. The County then filed a motion to alter or amend its order under Rule 59(e), asking the court to reconcile, among other issues, two apparently conflicting statements in the court's order: that the County "could defend the legality of the Ordinance by attempting to meet its burden to show that it has acquired R.S. 2477 rights on the land," id. at 565, and that the "Court need not make any final determination regarding the existence of any R.S. 2477 right-of-way in order to grant TWS's requested relief," id. at 566. Denying the motion in a short order, the court said, "[T]he court's Order needs no clarification." Id. at 670.

Shortly after the court denied the County's first motion to dismiss, the County rescinded Ordinance 2005-03. In May 2007, the County filed a second motion to dismiss under Rule 12(h)(3), arguing that its subsequent rescission of the ordinance mooted the case. Id. at 735-81. The court deemed the case not moot because some County road signs remained on federal land and the County

9

failed to show that it would not re-enact the ordinance. Id. at 1575.

Eventually, both parties moved for summary judgment. Id. at 1578-1613, 2218-39. TWS's motion requested a new remedy: it asked the court to enjoin the County from adopting ordinances or posting signs to open roads considered closed by federal law and management plans "unless and until Kane County proves in a court of law that it possesses a right-of-way to any such route." Id. at 1580. The County admitted that no court had issued a final determination that it possessed R.S. 2477 rights of way over the roads. Id. at 1868-69. But it protested that TWS had never identified the specific roads at issue, creating genuine issues of material fact, and that the action was "functionally equivalent to an action to quiet title." Id. at 1887-92. The County also sought partial summary judgment on its R.S. 2477 rights in two specific roads, Skutumpah and Windmill. Id. at 2218-39.

The district court granted TWS's motion and denied the County's. Id. at 2519-20. It declined to allow the County to establish the validity of its R.S. 2477 rights before deciding the merits. Id. at 2489. "First, the County has not filed a quiet title action in this case, and, second, even if it had done so, TWS is not the proper party to sue for quiet title." Id. The court declared that the County's signage and ordinance violated the Supremacy Clause and enjoined the County from similar actions "to invite or encourage vehicle use on any route or area closed to such use by governing federal land management plan or federal law."

10

Id. at 2519-20.  The County appealed the district court's denials of its motions to dismiss, the denial of its motion for partial summary judgment, and the grant of TWS's motion for summary judgment.  Id. at 2522-23.

Discussion

Aside from the merits of this action, Kane County raises three threshold questions: constitutional standing, prudential standing, and mootness.  See Chihuahuan Grasslands Alliance v. Kempthorne, 545 F.3d 884, 891 (10th Cir. 2008) (mootness); Keyes v. School Dist. No. 1, 119 F.3d 1437, 1445 (10th Cir. 1997) (standing).  Because TWS lacks prudential standing, we proceed directly to that issue without deciding whether TWS has constitutional standing or whether the case is moot.  See Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 584-85 (1999).[1]

1.      Prudential Standing Doctrine

We review de novo the district court's determinations regarding subject matter jurisdiction.  Kane County, 562 F.3d at 1085 (10th Cir 2009); Sac & Fox Nation of Mo. v. Pierce, 213 F.3d 566, 571 (10th Cir. 2000).  For federal courts to

---

[1] Even in a preemption challenge, a party must have constitutional standing which is jurisdictional.  Indep. Living Ctr. of S. Cal. v. Shewry, 543 F.3d 1050, 1064 (9th Cir. 2008).  Although prudential standing is not a jurisdictional limitation and may be waived, here it has been raised.  Id. at 1065 n.17; Finstuen v. Crutcher, 496 F.3d 1139, 1147 (10th Cir. 2007).

11

have jurisdiction over an action, "the party bringing the suit must establish standing." Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 11 (2004); see also Utah Animal Rights Coal. v. Salt Lake County, 566 F.3d 1236, 1240 (10th Cir. 2009). "For purposes of standing, we must assume the Plaintiffs' claim has legal validity." Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1093 (10th Cir. 2006) (en banc).

The Supreme Court's "standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, . . . and prudential standing which embodies 'judicially self-imposed limits on the exercise of federal jurisdiction.'" Newdow, 542 U.S. at 11 (quoting Allen v. Wright, 468 U.S. 737, 751 (1984)). To have Article III standing, "[t]he plaintiff must show that the conduct of which he complains has caused him to suffer an 'injury in fact' that a favorable judgment will redress." Id. at 12. The prudential standing doctrine encompasses various limitations, including "the general prohibition on a litigant's raising another person's legal rights." Allen, 468 U.S. at 751. "[T]he plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." Warth v. Sedlin, 422 U.S. 490, 499 (1975). "Without such limitations—closely related to [Article] III concerns but essentially matters of judicial self-governance—the courts would be called upon to decide abstract questions of wide public significance even though other governmental institutions may be more

12

competent to address the questions and even though judicial intervention may be unnecessary to protect individual rights." Id. at 500.

The question of prudential standing is often resolved by the nature and source of the claim. Id. "Essentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief." Id. In some situations, an implied right of action may exist. Id. at 501. "Moreover, Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules." Id.

The Supreme Court has held that a federal court has jurisdiction in a suit for "injunctive relief from state regulation, on the ground that such regulation is pre-empted by a federal statute, which by virtue of the Supremacy Clause of the Constitution, must prevail." Shaw v. Delta Airlines, Inc., 463 U.S. 85, 96 n.14 (1983). The Court has yet to weigh in, however, on whether the Supremacy Clause provides a cause of action. Neither do we need to do so today as a court sitting en banc. It is true that our prior panel decisions have concluded that when it comes to a Supremacy Clause challenge, it is not necessary to demonstrate that the preemptive federal statute creates a private right of action. Chamber of Commerce v. Edmondson, 594 F.3d 742, 756 n.13 (10th Cir. 2010); Qwest Corp. v. City of Santa Fe, 380 F.3d 1258, 1266 (10th Cir. 2004). In Chamber of Commerce, we reasoned that even if 42 U.S.C. § 1983 does not permit a

13

preemption claim, the plaintiffs could proceed under the Supremacy Clause in claiming that various measures enacted by Oklahoma were preempted by federal immigration law. 594 F.3d at 756 n.13. Nor does there appear to be any requirement that the preemptive federal statute create substantive rights in favor of a party arguing for preemption. Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 643-44 (2002); Indep. Living Ctr., 543 F.3d at 1059-62.

In Qwest, we relied upon Western Air Lines, Inc. v. Port Auth., 817 F.2d 222, 225 (2d Cir. 1987), which distinguished between a Supremacy Clause challenge and a private right of action. The former involves a claim that the local authority lacks the power to regulate given the supremacy of federal law, while the latter seeks to enforce the "substantive provisions of a federal law." Western Air Lines, Inc., 817 F.2d at 225-26. For purposes of today's holding, we as an en banc court can simply assume without deciding that the Supremacy Clause provides a cause of action—whether one exists or not, the prudential standing doctrine still bars TWS's claims.

2. The Prudential Standing Doctrine Applies

The district court held that prudential standing is not a concern whenever a plaintiff brings a "preemption-based challenge . . . under the Supremacy Clause." Aplt. App. 570. The panel opinion concluded that TWS had prudential standing, rejecting Kane County's assertions that TWS was (1) asserting the claims of the United States, (2) raising generalized grievances, and (3) relying on claims

14

outside the zone of interests protected by the Supremacy Clause. Wilderness Soc'y, 581 F.3d at 1216. According to the panel, TWS members are asserting independent harms to their recreational and aesthetic interests given Kane County's attempt to override the Monument Plan and federal management plans. Id. at 1217. Because the members used lands "within earshot of the disputed roads for recreational purposes" their grievances are specific and not general. Id. at 1217. Finally, even assuming that the zone of interests test applies in a preemption challenge, the panel concluded that the Supremacy Clause need only arguably be designed to protect persons harmed by preempted enactments. Id. In a footnote, the panel suggested that the zone-of-interests test might not apply or be redundant of the third-party standing inquiry. Id. at 1217 n.11.

Although Congress may relieve parties of meeting prudential standing requirements, the doctrine applies "unless it is expressly negated." Bennett v. Spear, 520 U.S. 154, 163 (1997). To be sure, as the district court stated, some cases seem to hold that prudential standing is unnecessary in a Supremacy Clause challenge. See Pharm. Research & Mfrs. of Am. v. Concannon, 249 F.3d 66, 73 (1st Cir. 2001), aff'd on other grounds sub nom. Pharm. Research & Mfrs. of Am. v. Walsh, 538 U.S. 544 (2003); cf. St. Thomas-St. John Hotel & Tourism Ass'n v. Gov't of the U.S. Virgin Islands, 218 F.3d 232, 241 (3d Cir. 2000). These cases make the point that the preemptive federal statute need not confer a benefit on the plaintiffs, much as we concluded in Qwest, 380 F.3d at 1265. Concannon, 249

15

F.3d at 73; St. Thomas-St. John Hotel & Tourism Ass'n, 218 F.3d at 241.  The

district court also relied upon Taubman Realty Group Ltd. P'ship v. Mineta,

which concluded that plaintiffs were not required to meet an additional standing

requirement concerning the zone of interests regarding a Supremacy Clause

challenge.  320 F.3d 475, 481 n.3 (4th Cir. 2003).  These cases do not resolve

another aspect of prudential standing, whether plaintiffs can assert the legal rights

of others.

That it may still be an issue is demonstrated by Concannon, where PhRMA

challenged a state statute essentially requiring manufacturers to enter rebate

agreements with the State and was able to assert the rights of Medicaid recipients.

249 F.3d at 74.  The court reasoned that vendors have historically been allowed to

challenge restrictions on their operations by advocating the rights of those

seeking their products.  Id.

3.      TWS Lacks Prudential Standing

TWS rests its claims on the federal government's property rights.  TWS

does not assert a valid right to relief of its own.  No provision—constitutional or

statutory—expressly grants TWS a right to relief.  TWS invokes the Supremacy

Clause of the U.S. Constitution, FLPMA, 43 U.S.C. § 1712, the Wilderness Act,

16 U.S.C. §§ 1131-36, the National Park Service Organic Act, 16 U.S.C. § 1, and

various regulations and agency decisions implementing the statutes.  Aplt. App.

16

609-11. None of these provisions creates an express private cause of action.[2] See Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001). That leaves only the Supremacy Clause. See Edmondson, 594 F.3d at 756 n.13; Qwest, 380 F.3d at 1266. Nonetheless, standing "often turns on the nature and source of the claim asserted." Warth, 422 U.S. at 500. In the context of prudential standing, "the source of the plaintiff's claim to relief assumes critical importance." Id.

TWS argues that it is not suing based on the legal rights of a third party, the federal government's property rights, but rather "is working to protect its conservation interests." Aplee. Br. at 37. This is indistinguishable from TWS's argument for constitutional standing: that the County's actions affect organization members' conservation interests. Id. at 31-32. But a party's interest for the purposes of constitutional standing does not automatically confer prudential standing. Prudential standing imposes different demands than injury in fact. See, e.g., City of Los Angeles v. County of Kern, 581 F.3d 841, 848 (9th Cir. 2009); MainStreet Org. of Realtors v. Calumet City, 505 F.3d 742, 745 (7th Cir. 2007). A party may suffer a cognizable injury but still not possess a right to relief. For

---

[2] Ordinarily, a plaintiff claiming a violation of FLPMA would sue under the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 701-06. See New Mexico ex rel. Richardson v. Bureau of Land Mgmt., 565 F.3d 683, 719 (10th Cir. 2009). But a suit brought under the APA seeks to compel a federal agency to follow the law, not to stand in the place of the federal agency to compel a state to follow the law. See 5 U.S.C. §§ 702, 706(2); Norton, 542 U.S. at 61-62. Accordingly, TWS has sued under the Supremacy Clause, not the APA. See Aplee. Br. at 33 ("TWS does not challenge any action or inaction by the federal government . . . .").

17

example, in <u>Hackford v. Babbitt</u>, the plaintiff alleged injury in the form of crop damage when the defendants diverted irrigation canals. 14 F.3d 1457, 1464 (10th Cir. 1994). Although this court assumed that the plaintiff had met the constitutional requirements for standing, he lacked prudential standing because he had no right to manage the irrigation project. <u>Id.</u> at 1466.

Its protests notwithstanding, TWS obviously seeks to enforce the federal government's property rights in the disputed rights of way. Its claims turn on the superiority of the federal government's property claim. If the County possesses valid R.S. 2477 rights of way in the roads, then its actions do not necessarily conflict with the BLM's management decisions. On the other hand, if the County does not possess rights of way in the roads, then the BLM's final decisions trump and invalidate the County's actions. This was the crux of TWS's motion for summary judgment: "Kane County has not — and cannot — demonstrate as a matter of law that the County can flout federal management plans and open roads on federal public land without <u>first</u> proving that it possesses rights-of-way to the alleged routes." Aplt. App. 1612. TWS seeks what it views as the enforcement of federal rights.

TWS has taken sides in what is essentially a property dispute between two landowners, only one of which is represented (Kane County). But TWS lacks any independent property rights of its own. In that light, Judge McConnell's analogy is apt:

18

> Imagine that my next-door neighbor, who keeps his property neat and tidy, is faced with a competing claimant to the land, who is likely to allow the property to fill with weeds. I might very much hope my neighbor wins. My property values and aesthetic interests could seriously be affected. I may be impatient with my neighbor's inclination toward compromise and apparent disinclination to go to court. But no one would say I have standing to sue in defense of my neighbor's property rights. The Wilderness Society is in precisely that situation.

Wilderness Soc'y, 581 F.3d at 1232 (McConnell, J., dissenting).

The Supreme Court's reasons for the general rule against third-party standing counsel against TWS's standing in this case. We "must hesitate before resolving a controversy . . . on the basis of the rights of third persons not parties to the litigation" for two reasons. Singleton v. Wulff, 428 U.S. 106, 113 (1976). "First, the courts should not adjudicate such rights unnecessarily, and it may be that in fact the holders of those rights . . . do not wish to assert them . . . ." Id. at 113-14. BLM's absence from this case indicates that it does not wish to assert its rights against Kane County at this time or in this fashion. "Second, third parties themselves usually will be the best proponents of their own rights. The courts depend on effective advocacy, and therefore should prefer to construe legal rights only when the most effective advocates of those rights are before them." Id. at 114. Although this court has disagreed whether the federal government may adequately represent conservation groups' interests in R.S. 2477 quiet title cases, see Kane County, 597 F.3d at 1134 (summarizing San Juan County's various opinions), surely the federal government is the best advocate of its *own* interests.

19

Sometimes a case may present "countervailing considerations" which "may outweigh the concerns underlying the usual reluctance to exert judicial power when the plaintiff's claim to relief rests on the legal rights of third parties." Warth, 422 U.S. at 500-01; see also Kowalski v. Tesmer, 543 U.S. 125, 129-30 (2004). No such considerations are present here. First, the federal government's property right is not "inextricably bound up with the activity the litigant wishes to pursue" like the cases in which the Supreme Court has recognized a doctor's ability to assert his patient's privacy rights because of their confidential relationship. Singleton, 428 U.S. at 114-15 (citing Doe v. Bolton, 410 U.S. 179, 188-89 (1973); Eisenstadt v. Baird, 405 U.S. 438, 445-46 (1972); Griswold v. Connecticut, 381 U.S. 479 (1965)). Second, even where a close relationship exists between the litigant and the third party, "some genuine obstacle" to the third party asserting his own rights must exist. Id. at 116. No apparent obstacles prevent the federal government from asserting its own rights against Kane County, as this court has already recognized. See Kane County, 597 F.3d at 1135. Thus, without any circumstances in favor of allowing TWS to assert the federal government's legal rights, TWS lacks prudential standing.

4.     The Dissent

The dissent suggests that the court's analysis is the product of "extreme means" which misstates and misconstrues the positions of the parties and the district court to nullify the district court's injunction. Yet it is the panel decision

20

that represents a broad shift in our caselaw.  See, e.g., Lindsay Houseal,

Wilderness Society v. Kane County, Utah: A Welcome Change for the Tenth

Circuit and Environmental Groups, 87 Denv. U.L. Rev. 725, 740-41 (2010)

(suggesting that the panel decision represents a shift in favor of the federal

government and environmental plaintiffs over the interests of local government).

According to the dissent, the case is not about property rights, and it faults the

court for concluding that the United States' property rights can be destroyed

outside a quiet title action contrary to Supreme Court precedent and creating a

circuit split.  The dissent contends that the claim advanced by TWS is merely one

concerning the power to regulate and because Kane County did not prove its

claims in a quiet title action, neither the district court nor we have any occasion to

consider property rights.  The dissent further contends that TWS has prudential

standing because its members have been injured and that the United States is not

the exclusive plaintiff in a Supremacy Clause challenge.

   After acknowledging the possibility that "some or all of the R.S. 2477

rights-of-way claimed by Kane County are valid," the dissent reaches the

conclusion it does concerning prudential standing because of its views about the

merits of the property interests in this case.  See Dissent at 2 (contending that the

court's opinion "elevates any claim to R.S. 2477 rights-of-way . . . to a status

superior to validly promulgated federal rules and regulations that manage public

lands"); id. at 3 (noting that "[b]y definition, off-road vehicles and all-terrain four

21

wheelers are designed to be driven off roads and across all terrains," and that "R.S. 2477 rights have been falsely claimed over dry creek beds, horse and hiking trails, and jagged rock outcroppings"); id. at 1-2, 12-13 (suggesting that the exclusive means to establishing R.S. 2477 rights is through a quiet title action); id. at 24 n.7 (discussing "the ubiquity and ostensible lack of merit to many R.S. 2477 claims"); id. at 14-15 (concluding that even if Kane County established its R.S. 2477 rights, they still would be subject to federal regulation as easements). The dissent understandably is concerned with false R.S. 2477 claims as a basis for easements in federal land. At a minimum and fortunately as a matter of prudential standing, the dissent's solution ought to receive the benefit of input by the real-party-in-interest (the United States) before being adopted in the context of a Supremacy Clause challenge. That solution allows a third-party (with no interest in the property) to force a quiet title action; absent participation and victory in that quiet title action, the R.S. 2477 claimant loses.[3] This is an anomaly given a legislative and administrative ordering scheme that expressly recognizes and defers to valid, existing R.S. 2477 rights. It also has implications for our cases and longstanding practice which has recognized R.S. 2477 rights and several other mechanisms for resolving such disputes. See Wilderness Soc'y, 581 F.3d at 1235-36 (McConnell, J., dissenting); SUWA, 425 F.3d at 741.

---

[3] The Quiet Title Act has a twelve-year limitations period. 28 U.S.C. § 2409a(g).

Contrary to the dissent's claim, this court's decision in no way holds that "the United States may be stripped of its property rights outside a QTA claim," Dissent at 14, nor does it conflict with cases construing or applying the QTA such as Block v. North Dakota, 461 U.S. 273 (1983), Shawnee Trail Conservancy v. United States Dep't of Agriculture, 222 F.3d 383 (7th Cir. 2000), and Montanans for Multiple Use v. Barbouletos, 568 F.3d 225 (D.C. Cir. 2009). The decision recognizes that given the unique nature of the interest involved and TWS's claims, the government must be heard. It also recognizes that we cannot dispense with "a real party in interest bring[ing] a properly focused conflict to the attention of a court, with evidence to back it up." Wilderness Soc'y, 581 F.3d at 1237 (McConnell, J., dissenting). If anything, the cases relied upon by the dissent plainly support the idea that TWS is not the proper plaintiff here. Block merely holds that the QTA is the exclusive means for an adverse claimant to challenge the government's title. 461 U.S. at 286. It does not, nor could it, purport to be the exclusive means of recognizing R.S. 2477 rights. It says nothing about a third-party forcing a QTA challenge by another with an interest in the property or disregarding the efforts of parties with an interest in the property to settle their differences.[4] Under the dissent's approach, even if the government and Kane County agreed about the nature and extent of an R.S. 2477 easement or the scope

---

[4] According to the dissent, Kane County brought this on itself by raising an affirmative defense of title to the TWS lawsuit. Dissent at 20 n.6.

23

of federal regulation, TWS would be a proper plaintiff to challenge any agreement under the Supremacy Clause. See Wilderness Soc'y, 581 F.3d at 1237 (McConnell, J., dissenting). This would turn the QTA on its head.[5]

In Shawnee Trail, the Seventh Circuit rejected the efforts of interest groups (like TWS) to challenge the regulatory authority of United States, notwithstanding that the groups made no claim to quiet title in themselves. 222 F.3d at 386. Montanans for Multiple Use involved plaintiffs who wanted ownership of roads and trails closed by the Forest Service. 568 F.3d at 228. Not surprisingly, the plaintiffs had to proceed under the QTA. Although the dissent maintains that Kane County must engage in a quiet title action, the decision on any remedy (assuming the government were aggrieved) belongs to the United States, and the parties are free, as they have, to engage in conciliation.

The dissent contends that TWS has prudential standing simply because its members have suffered alleged aesthetic or recreational injury and have a right to be heard on the supremacy of federal rules and regulations, but of course, prudential standing moves beyond injury in fact and addresses whether a plaintiff is asserting its own legal rights rather than resting on the rights or interests of

---

[5] The dissent tells us that "[i]f the United States did not claim an interest in the alleged R.S. 2477 rights, there would be no preempting federal rule upon which to base such a challenge." Dissent at 11 n.5. The government will probably always claim some interest (given the nature of an easement or right of way), even more so under the dissent's analysis where "subject to valid existing rights" means nothing, absent a quiet title action. See Wilderness Soc'y, 581 F.3d at 1236-37 (McConnell, J., dissenting).

24

third parties.  See Warth, 422 U.S. at 499.  As discussed above, we conclude that TWS's claim is derivative of that of the United States.  We do not quarrel with the notion that there can be more than one plaintiff (and other than the federal government) in a Supremacy Clause challenge.  But contrary to the dissent, we think that more than vindicating the federal government's right to regulate is at issue here.  That right is expressly conditioned on the recognition of existing local property rights and necessarily entails the discretion of the United States as a property owner.

We VACATE the district court's summary judgment in favor of TWS and REMAND with instructions to dismiss the action.

08-4090, *Wilderness Society, et al v. Kane County, et al*

**GORSUCH, J.,** concurring in the judgment, joined by **BRISCOE,** Chief Judge, and **O'BRIEN**, Circuit Judge.

I reach the same destination as the majority but by a different path. Most of this case is moot — and has been for years. What little of this lawsuit that remains fails to implicate our jurisdiction because even a favorable decision won't redress the Wilderness Society's claimed injury. For these reasons, and like the court, I would vacate the district court's decision with instructions to dismiss this case.

*Mootness*

The Wilderness Society's central challenge in this lawsuit is to a short-lived, long-defunct ordinance. Enacted in August 2005, that ordinance authorized Kane County officials to open certain roads to off-highway vehicles (OHVs), and to place decals on county road numbering signs alerting drivers of this policy. After the Society filed suit, asserting that the Bureau of Land Management's (BLM) management plan preempted the County's ordinance by forbidding OHVs from using the roads in question, the County quickly rescinded its ordinance in 2006 and removed all of its OHV-authorizing decals. Without the ordinance and decals in place, OHV traffic isn't permitted on the roads in question — and hasn't been for *four years*. *See* Utah Code Ann. § 41-22-10.3 ("A person may not operate an off-highway vehicle upon any street or highway, not designated as open to off-highway vehicle use . . . ."). There are no OHVs left to fight over;

the Society won exactly the relief it sought merely by filing its lawsuit; still, this litigation has lumbered on, with the parties and the lawyers fighting about OHV traffic that is and has long been forbidden. This isn't so much a live lawsuit as it is the ghost of a lawsuit past.

We don't usually prolong litigation in this way, allowing the fight to continue after one side has thrown in the towel. Especially when carrying on the fight requires us to decide novel and hotly disputed questions of law. Instead, when we face situations like this, we usually say that the controversy has become "so attenuated that considerations of prudence and comity . . . counsel the court to stay its hand," at least as a matter of judicial restraint if not constitutional imperative. *Southern Utah Wilderness Alliance v. Smith*, 110 F.3d 724, 727 (10th Cir. 1997) (internal quotation omitted). This practice "pertains throughout the life of a case. So even if a lawsuit involved a live dispute" at one stage, if at *any* point the dispute dissipates "we will say that the suit has become moot." *Wyoming v. U.S. Dep't of Interior*, 587 F.3d 1245, 1250 (10th Cir. 2009). This rule "holds true even if all the parties before us still wish us to render an opinion to satisfy their demand for vindication or curiosity about who's in the right and who's in the wrong. Our job is to decide cases that matter in the real world, not those that don't." *Id*. For one, I would follow this cautionary rule of restraint and dismiss the bulk of this suit.

Of course, a defendant's "voluntary cessation of a challenged practice" is

2

not *always* enough to render a case moot. *See City of Mesquite v. Aladdin's Castle, Inc.*, 455 U.S. 283, 289 (1982). This court has, however, "preclud[ed] a mootness determination in cases challenging a prior version of a state statute only when the legislature *has openly expressed its intent to reenact the challenged law*." *Camfield v. City of Oklahoma City*, 248 F.3d 1214, 1223 (10th Cir. 2001) (emphasis added). And in *this* case, the County hasn't expressed any such intent. Just the opposite. In deposition testimony and a press release accompanying the ordinance's repeal in 2006, Kane County commissioners repeatedly stated that they wished first to resolve the existence and scope of the County's R.S. 2477 rights — including whether those rights allow it to sanction OHV use in the face of a contrary federal management plan — through a quiet title action before considering any modified ordinance allowing OHV use. *See, e.g.,* Aplt. App. at 839 (public notice explaining the County's intent to put off the question whether and under what circumstances to allow OHV traffic until "after, first, securing federal recognition of Kane County's ownership of R.S. 2477 rights-of-ways . . . and [after] other related legal issues are more fully resolved"); *id.* at 1212-1218, 1228. And over the last four years, the County has followed exactly the course it promised, pursuing a separate and still ongoing quiet title action to ascertain the scope of its R.S. 2477 rights. *See Kane County v. United States*, No. 2:08-CV-0315 CW (D. Utah).

At the very most, the evidence before us suggests only that the County

3

*might* enact *a different* ordinance in the future *after* resolving the legal uncertainties surrounding the scope of its R.S. 2477 rights — all in a careful attempt to *avoid* disputes like this one. And there can be little doubt that such a different ordinance, if it is ever enacted and then challenged, will present different legal and factual questions for decision. For example, a new ordinance might close roads to OHV use that the old ordinance sought to open, or seek to open roads the old ordinance closed to OHVs. The operative federal management plan might be different than the one now in place, as a result of ongoing negotiations between federal agencies and the County. And by the time any new ordinance is enacted, we may know the results of the County's quiet title action and so have a firmer grip on the scope of its R.S. 2477 rights of way. So it is that the outcome of any new dispute between the parties will surely turn on new legal and factual circumstances.

Just as certain, the courts can and will address those questions if and when they arise. But the fact that we may lawfully decide the fate of a new and different ordinance raising new and different legal and factual questions in a different lawsuit at some later date doesn't mean we should keep on life support a lawsuit about a defunct ordinance the County itself left for dead years ago. *See, e.g., Unified Sch. Dist. No. 259 v. Disability Rights Ctr. of Kan.*, 491 F.3d 1143, 1150 (10th Cir. 2007) (holding that mootness applies because future instances of wrongful conduct "may be quite different" than that alleged); *Md. Highways*

4

*Contractors Ass'n., Inc. v. Maryland*, 933 F.2d 1246, 1249-50 (4th Cir. 1991) ("The statute challenged by the Association no longer exists; a new statute replaced it. In order to determine if someone has been injured by the new statute, we would need more information about the new statute than is presently before us."); 13C Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 3533.6, at 318-19 (3d ed. 2008) ("If the questions that seem to remain open after the revision are quite different from the questions that were initially disputed, it may seem better simply to terminate the present proceeding, so that the new questions can be addressed in other litigation specifically framed for that purpose.").[1]

---

[1] In some places, the dissent seems to suggest incorrectly that this lawsuit remains alive simply because the County harbors the desire to enact a different law at a different time after the quiet title action sorts out its R.S. 2477 rights. *See* Dissent at 25-26. In other places, the dissent seems to acknowledge the correct legal standard under *Camfield* and to argue that the record proves the County intends to reenact its prior ordinance immediately. *Id.* But the portions of the record the dissent cites prove the opposite. For example, the dissent quotes a couple lines from a County commissioner's deposition. *See* Dissent at 25. When read in full, however, that deposition shows that the County and its commissioners do *not* intend to reenact the *same* ordinance but intend to wait "until [they] feel confident of the legal issues at play and until [they] consider a *modified* ordinance that would address several issues that [they] saw in the original ordinance." Aplt. App. at 1212 (emphasis added); *see also id.* at 1216-17 ("[T]he wisest course of action was to resign our OHV ordinance, focus this on a property-rights issue and deal with the OHV and federal regulation case law issues down the road. And I'll admit that I'm not ready to jump right back into that fray of OHV regulation. I think it's going to require a lot of reflection on my part and consultation with attorneys before I recommend another OHV ordinance."). Likewise, the dissent quotes only a part of a sentence of a County press release. *See* Dissent at 25. But the relevant sentence, when read in full,

(continued...)

*Redressability*

While the Society's complaint is primarily directed at the County's defunct ordinance and discarded decals that used to authorize OHV traffic, one smaller aspect of its complaint remains. The Society also challenges the County's practice of erecting county road numbering signs (*e.g.*, "Kane County, K3935") on its claimed R.S. 2477 rights of way inside BLM lands. These signs are aimed only at identifying the road for routine public traffic; they do not authorize or permit OHV usage on the roads in question. *See* Utah Code Ann. § 41-22-10.3; *supra* n.1. Even so, we should declare the County road numbering signs impermissible under the Supremacy Clause, the Society says, because BLM regulations preempt them.

Neither does this part of the Society's claim appear moot. While the

---

[1](...continued)
says benignly that "[l]itigating county transportation system roads as both a property right and an OHV management issue in federal court is too big a bite of the apple at the same time." Aplt. App. at 839. Finally, the dissent says it's "especially" telling that Kane County retained its *county road number signs* "until the threat of contempt forced it" to remove them. *See* Dissent at 24-25. But the undisputed facts show that the County *voluntarily* rescinded its OHV ordinance and removed all OHV-authorizing decals quickly after the Society filed suit; no judicial compulsion was involved. It is also beyond cavil that, under Utah law, without the ordinance and decals, OHV traffic is *forbidden by law*; unsurprisingly, mere road numbering signs don't suffice to authorize OHV traffic on Utah public highways. Utah Code Ann. § 41-22-10.3. Of course, I freely admit (and discuss in a moment further) that the fact the County chose to keep its road numbering signs in place until a court ordered their removal means that the Society's *separate* challenge to *those* signs isn't moot. But this only serves to highlight the particular and different posture of OHVs, the fact that the County does forbid and has long forbidden them, and that any dispute over them is moot.

County quickly rescinded its OHV ordinance and removed its OHV authorizing decals after the Society filed suit, and thus disallowed OHV traffic, the County has continued to assert its right simply to post county road numbering signs on its claimed R.S. 2477 rights of way for the convenience of other travelers, and the County did continue to litigate *this* issue before the district court. So the question remains whether the County can post road numbering signs, even if it no longer purports to permit OHVs.

But while this portion of the lawsuit isn't moot, the Society faces another problem. To claim standing to sue under Article III, a plaintiff must satisfy three "irreducible constitutional" elements — it must have suffered an "injury in fact"; the complained-of conduct must have caused the injury; and there must be a "likelihood that the requested relief will redress the alleged injury." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-61 (1992); *Steel Co. v. Citizens for a Better Env.*, 523 U.S. 83, 103 (1998). Even assuming without deciding the Society can meet the first two of these elements, it cannot satisfy the third.

By way of relief, the Society asks us to invoke the Supremacy Clause and enjoin County laws or actions inconsistent with federal law. *See* Const. Art. VI, cl. 2.[2] In this case, however, if any conflict exists it is *only* between competing

---

[2] For purposes of this analysis, I follow the court's lead and assume without deciding that the Supremacy Clause affords a private right of action, and that such an action can be brought against state policies and practices as well as laws. Whether any of this is true is far from clear, of course. In *Shaw v. Delta*

(continued...)

7

claims arising under *federal* law. On the one hand, the Society argues that certain federal BLM regulations, issued pursuant to the Federal Land Policy and Management Act, *closed* the roads in question to any traffic. *See* Federal Land Policy and Management Act of 1976 ("FLPMA"), Pub. L. No. 94-579, § 701(h), 90 Stat. 2744, 2786; *see also* 43 U.S.C. § 1782(c). On the other hand, it was undisputed that the County asserts its entitlement to post road numbering signs on the lands in question *only* by virtue of another *federal* statute, R.S. 2477. *See* Act of July 26, 1866 ("R.S. 2477"), ch. 262, § 8, 14 Stat. 251, 253, *codified at* 43 U.S.C. § 932, *repealed by* FLPMA § 706(a), 90 Stat. at 2786 (preserving any R.S. 2477 right of way existing before October 21, 1976). In this way, the County is not acting pursuant to authority given to it by any state law but merely asserting a proprietary interest arising from federal law — a proprietary interest that a private

---

[2](...continued)
*Airlines, Inc.* the Supreme Court noted that it had *jurisdiction* to hear a Supremacy Clause challenge but said nothing about the existence of an implied *private right of action.* 463 U.S. 85, 96 n.14 (1983). To the contrary, the Court has repeatedly urged caution when it comes to the business of "finding" implied rights of action. *See, e.g., Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001) ("Like substantive federal law itself, private rights of action to enforce federal law must be created by Congress. . . . [C]ourts may not create one, no matter how desirable that might be as a policy matter . . . ."). And there's plenty of reason for caution here. For example, finding a private cause of action as a constitutional matter would permanently deprive Congress the power *not* to provide a right of action in its laws for private individuals to sue for Supremacy Clause violations. At the same time, doing so may be needless if the Declaratory Judgment Act or some other statute *already* provides a vehicle for bringing Supremacy Clause challenges, a possibility the parties in this case allude to but don't explore.

8

individual might just as easily claim when posting road signs along his or her R.S. 2477 right of way (*e.g.*, "two miles to the family ranch").

None of this is to say that the County's federal law claim under R.S. 2477 is necessarily a winning one. It isn't at all clear whether (or to what degree) the holder of an R.S. 2477 right of way is entitled to regulate traffic on that right of way. Or whether (and to what degree) competing federal legislation protecting national lands may authorize BLM to restrict the ability of an R.S. 2477 holder to post numbering signs. Fact is, federal law doesn't always point harmoniously in a single direction — and when it comes to land policy this is perhaps particularly true. Enacted in the nineteenth century, R.S. 2477 sought to promote development by allowing all comers to establish rights of way through federal property without any procedural formality, but by simply asserting and using them. In contrast, contemporary federal land use statutes and regulations like BLM's give comparatively more attention to conservation. Trying to reconcile these two competing strands of federal law presents many sticky questions: Are BLM regulations purporting to regulate rights of way Congress granted in R.S. 2477 consistent with and reasonable interpretations of the FLPMA? If they are, to what extent do they allow BLM to limit the use of rights of way granted by R.S. 2477? Does an R.S. 2477 right of way holder have to prove its existing rights before exercising those rights in a federally regulated monument or park? Or may the holder use its right of way without pursuing any procedural formality?

9

All of these are intriguing questions about which federal legal entitlement must give way, and to what extent.

But, critically for our purposes, no dispute involving only competing *federal* entitlements can ever present a redressable *Supremacy Clause* claim. And that's the only claim presented in this lawsuit. Any possible relief we might give in a Supremacy Clause case — say, a declaration telling the County to stop enforcing a state law or policy, or an injunction voiding state law — won't do the Society any good, won't redress its asserted injuries. This is because no order we could issue under the Supremacy Clause could prevent the County from continuing to assert its *federal* rights. *Cf. Warth v. Seldin*, 422 U.S. 490, 506 (1975) (voiding the challenged zoning ordinance would not redress plaintiffs' claimed injury from lack of low-income housing); *Linda R.S. v. Richard D.*, 410 U.S. 614, 618 (1973) (no redressability, where plaintiff's request that prosecutors file criminal charges against the father of her child would not result in child support). It may be that the Society has some *other* claim it might bring seeking to sort out the parties' conflicting assertions of federal rights. But it simply doesn't possess a redressable Supremacy Clause claim.[3]

---

[3] In entering an injunction telling the County to remove its signs despite this claim of *federal* authority, the district court necessarily (if implicitly) first invalidated the County's asserted federal R.S. 2477 right. In this way, the district court's injunction resolved an issue of conflicting claims under *federal law* adversely to the County. Essentially, the district court took up and decided a federal quiet title cause of action against the County with respect to the right to

(continued...)

10

*Prudential Standing*

I bother to go down this road only because of the nettles lining the prudential standing path.  Prudential standing doctrine exists, of course, to prevent a party from asserting rights that really belong to a third party.  *See*

_____

[3](...continued)
place numbering signs — and this of course it had no power to do in a case alleging only a Supremacy Clause cause of action.  The dissent makes this same mistake even while contending that I've erred by "conflating standing and the merits."  Dissent at 27.  Tellingly, however, the dissent doesn't point to any merits question I decide against the Society.  It doesn't because, of course, all I do is *identify* the fact that the parties' competing — and unresolved — positions arise entirely under federal law and so can't present a redressable Supremacy Clause claim.  And this much we are constitutionally obliged to do.  As courts of limited jurisdiction, federal courts are duty bound to examine facts and law in every lawsuit before them to ensure that they possess subject matter jurisdiction.  Unsurprisingly, this duty includes the obligation to examine, as here, whether a *favorable* judgment on the plaintiff's chosen cause of action would redress its claimed injuries.  In *Steel Co.*, for example, the plaintiff sought as relief certain pre-litigation costs, but the statute under which the plaintiff sued didn't allow recovery of such costs.  *See* 523 U.S. at 108-09.  Recognizing that even a favorable judgment on the plaintiff's chosen cause of action would fail to provide it with its requested relief (even if other causes of action might have succeeded), the Supreme Court dismissed the suit for lack of redressability.  *See id.*  Our case is in exactly the same posture.  Perhaps recognizing this, the dissent falls back and tries to suggest that Kane County *is* actually asserting a *state* law interest arising from Utah Code §§ 41-22-10.1, 10.5, 72-3-103, 105 that a Supremacy Clause claim could remedy.  *See* Dissent at 28-29.  As it happens, however, the Title 41 provisions the dissent cites have *nothing* to do with the County's claimed authority to post road numbering signs on its claimed R.S. 2477 rights of way — they concern only the (moot) question of OHV regulation.  Meanwhile, the Title 72 provisions the dissent cites allow the County to regulate other forms of traffic over R.S. 2477 rights of way *only* if and when the County possesses a valid *federal* R.S. 2477 claim to the right of way in question — thus confirming again the purely *federal* nature of the parties' dispute.  *See* § 72-5-301(7) (defining R.S. 2477 highways, which a county may regulate under subsequent provisions, as those constructed in accordance with federal law).

11

*Warth*, 422 U.S. at 499. The majority says it's clear from the nature of the Society's lawsuit that it is seeking only to vindicate the property rights of the United States. The dissent takes issue with this characterization of the Society's complaint. In the dissent's view, the Society's complaint doesn't allege that BLM or any other federal entity has a superior property interest to the County. Rather, the Society alleges that BLM's published management plan, regulatorily adopted pursuant to statutory authority under the FLPMA, deems certain roads closed to traffic, and the Society seeks to vindicate its members' *own interests* in seeing that plan enforced as written. Simply put, in the dissent's view, Society members don't care who owns what rights, they only seek the enjoyment of the wilderness according to what (they say) the BLM's regulations, as embodied in the published management plan, specify.

Respectfully, I don't see any need to be drawn into this briar patch and tussle over the true and best meaning of the Society's complaint. However its complaint is construed, the Society has no case left to pursue. Most of its suit is long dead, gone, moot. What very little is left isn't redressable under the Supremacy Clause. That alone is enough to end this case. It may be that the Society has other means for obtaining relief, other claims to be brought in other suits. The questions whether and to what degree the County may permit OHVs and signs may be resolved in the ongoing quiet title action. Future and different ordinances may beget future and different lawsuits. But none of this means that

12

we may take up the interesting questions associated with the Society's and County's and BLM's competing federal law claims in any old lawsuit. We are courts of limited jurisdiction, with a written charter and prudential doctrines aimed at cabining our discretion, cautioning restraint in the face of temptation, and protecting us from improvident decisions. We may only address the questions put to us, and we may do so only when we have clear jurisdiction and legal authority. That much is lacking here. I respectfully concur.

08-4090, <u>Wilderness Society, et al. v. Kane County, et al.</u>

**LUCERO**, Circuit Judge, dissenting, joined by **HOLLOWAY**, Circuit Judge.

This is a pivotal case which, unless reversed or modified, will have long-term deleterious effects on the use and management of federal public lands. It also expands the doctrine of prudential standing by arrogating to appellate courts unbounded and unprecedented authority to reverse trial court decisions without addressing the merits. Rather than following the clear precedent of the Supreme Court, this circuit, and other circuits, the majority instead utilizes extreme means to nullify the trial court's injunction prohibiting Kane County from substituting its own policies for a duly enacted federal management plan on federal public lands. Because it seems to me patently inappropriate to misstate and misconstrue the positions of the parties and the rulings of the trial court to achieve this result, I respectfully but emphatically dissent.

Despite the claims of the parties, we are told that this case is not about preemption but about property. The Quiet Title Act ("QTA") is turned on its head and it is declared that only the dominant holder of property—the United States—may vindicate its regulations against a claimed R.S. 2477 right-of-way. A citizen's right to protest and be heard on the supremacy of federal rules and regulations is ignored, and notwithstanding the resulting chaos in the management of federal public lands, the majority declares: prudence dictates that the federal courts should remain silently in their chambers.

Perhaps some or all of the R.S. 2477 rights-of-way claimed by Kane County are valid. But the validity of these claimed rights-of-way is not properly before us. The United States' title was not—and could not be—determined in this litigation because

Kane County chose not to bring a claim against the United States under the QTA, "the exclusive means by which adverse claimants [may] challenge the United States' title to real property." Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands, 461 U.S. 273, 286 (1983) (footnote omitted).

Kane County's primary claim of error is that the trial court acted improperly when, as mandated by Block, it required the County to assert a QTA claim against the United States in order to advance the affirmative defense of R.S. 2477 rights-of-way ownership. Yet the majority decision on prudential standing trumps consideration of that question and all other issues properly brought to us by the parties. On the basis of claimed prudence, the en banc court elevates any claim to R.S. 2477 rights-of-way—irrespective of validity or scope, no matter how fanciful or inventive—to a status superior to validly promulgated federal rules and regulations that manage public lands. Tomorrow, Kane County can proceed with its signage program.

But only by erroneously asserting that property rights were at stake in this case can the majority contend that the plaintiffs lack prudential standing. As a consequence of this erroneous analysis, the majority has concluded that the United States' title to real property can be destroyed outside of a QTA claim, violating Block and creating a circuit split with the Seventh and District of Columbia Circuits, which have each properly prohibited claimants from asserting R.S. 2477 rights over federal land outside of a QTA action. See Montanans for Multiple Use v. Barbouletos, 568 F.3d 225, 228-29 (D.C. Cir. 2009); Shawnee Trail Conservancy v. U.S. Dep't of Agric., 222 F.3d 383, 386-88 (7th Cir. 2000).

By definition, off-road vehicles and all-terrain four wheelers are designed to be driven off roads and across all terrains. When coupled with the inescapable truth that in the past R.S. 2477 rights have been falsely claimed over dry creek beds, horse and hiking trails, and jagged rock outcroppings, the resulting anarchy and chaos in the national parks, national monuments, and federal public lands lying within this circuit is profound.

**I**

Before addressing the merits of the majority opinion, I clarify some initial facts. A full version of the factual narrative leading up to this case is available in the original panel decision, see Wilderness Society v. Kane County, 581 F.3d 1198, 1205-09 (10th Cir. 2009), but some general points are worth noting. As does the panel dissent, the majority mischaracterizes the history of this dispute as an oasis of peace in which Kane County cordially sought to assert its R.S. 2477 rights. Contrary to this idyllic narrative, the County unilaterally acted upon its own interpretation of the law, and it was only after Kane County officials took aggressive action that the plaintiffs filed suit.

The majority begins its opinion by asserting that the events relevant to this case started when Kane County "requested" that the Bureau of Land Management ("BLM") take down road signs it had placed inside federal lands. (Majority Op. 6.) This is a generous reading of the verb "to request," which generally implies permission or at least some level of deference. In its March 2003 letter, Kane County declared in no uncertain terms that BLM road signs violated "county policy" and constituted an "intrusion against the rights of the dominant estate." Although acknowledging the existence of the federal land management plan closing certain roads to off-highway vehicle travel, the County

-3-

demanded that BLM take down its signs "within a timely period of sixty days" and insisted that BLM management "instruct" its employees not to give the public "verbal misinformation" that the claimed roads were closed to off-highway vehicle use. Near the end of its letter, the County expressly stated its intention to pass an ordinance opening the disputed roadways to "[all-terrain vehicle] and motorcycle travel."

Five months later, despite ongoing negotiations over the disputed roads, Kane County sent a letter to BLM quixotically declaring the road signs to be in violation of state law. It threatened fines and "the recovery of costs and expenses" for removal of the signs if BLM did not take them down promptly. Around this same time, the County unilaterally removed approximately thirty BLM road signs restricting off-highway vehicle travel on federal lands. The "return" of the signs, left outside a BLM office, was accompanied by a threatening letter.

Approximately a year and a half later, Kane County began a program of erecting its own signs on the disputed roadways. These signs opened the disputed routes to all forms of off-highway vehicle use. According to the plaintiffs, Kane County placed 268 signs on BLM lands, including 103 inside the Grand Staircase-Escalante National Monument, at least sixty-three of which purported to open routes to off-highway vehicle travel otherwise restricted by the federal land management plan. It was only after posting its signs that the County decided to pass an ordinance authorizing its actions. Moreover, the County's eventual decision to remove "some" of its signs "pending consideration of the roads' status and uses" and rescind its ordinance was based on its

conclusion that doing so would help it to "secure the most successful legal resolution to current federal roads litigation."

Contrary to the majority's fanciful tableau of serenity and goodwill, the situation at the time the plaintiffs filed suit was chaotic and hostile. The County declared an all-terrain vehicle "vroom-vroom" free-for-all on lands within the Grand Staircase-Escalante National Monument, wilderness areas, and other protected federal lands in direct contravention of federal management plans. If anything, the district court's adjudication of the issues presented in this case is commendable for its prudent judgment.

## II

The majority's understanding of the parties' positions and posture is simply wrong. Plaintiffs brought this case to enjoin a preempted local ordinance that was harming their aesthetic and recreational interests. That ordinance conflicted directly with federal regulations banning off-highway vehicle use on protected federal lands. Instead of addressing plaintiffs' actual claims, the majority recasts this entire case as a dispute over property rights, allowing it to conclude that plaintiffs were asserting the United States' interests rather than their own. But although the majority may enjoy the power of its own opinion, it does not have the power to select the facts, and as a factual proposition, title of the United States to the property at issue was never properly challenged.

Beyond the majority's peculiar alchemy in converting the case argued below into the one which produces its favored outcome, today's opinion is even more fundamentally troubling. Recasting this case as a property dispute displays a clear misapprehension of

the manner in which federal property rights may be challenged and the extent of federal authority over claimed R.S. 2477 rights-of-way.

## A

Rehearing in this case was granted to reconsider, and the parties were asked to brief, numerous issues.[1] The original panel's ruling on four of those issues is left unaddressed. The only holding announced today relates to prudential standing—a topic to which the County devoted five paragraphs of its 120 pages of briefing on appeal.

In deciding this case on prudential standing, the majority distorts plaintiffs' claims beyond all recognition. Plaintiffs' complaint states a straightforward Supremacy Clause claim. They allege that Kane County's "passage of Ordinance 2005-3 and the destruction of BLM signs and erection of County route signs on BLM lands[] conflicts with federal statutes and regulations." Yet the majority refuses plaintiffs the right to state their own claims. Rather than consider the preemption case that was pled, litigated, and decided,

---

[1] Those issues are:

1) Whether the Plaintiffs have constitutional standing, i.e., whether the Plaintiffs have a "legally protected interest" and prudential standing;
2) Whether the Supremacy Clause provides the Plaintiffs with a private right of action;
3) Whether a local government may exercise R.S. 2477 rights over federal lands in a manner that conflicts with the federal management regime without filing a Quiet Title Act suit with respect to those rights;
4) Whether a local government may assert R.S. 2477 rights defensively without seeking to join the landowner in the action; [and]
5) Whether this matter is moot in light of, among other things, Kane County's decision to rescind its ordinance and remove the relevant road signs.

(Order of Feb. 5, 2010.)

-6-

the majority decrees that this case is "essentially a property dispute between two landowners." (Majority Op. 18.) This announcement will certainly come as a surprise to the plaintiffs, who never advanced such a case, and to the district court that never decided such a case.

But in its haste to recast this case to more neatly fit into a predetermined narrative, the majority overlooks the fact that this case could not possibly decide any property rights and thus could not possibly be a mere "property dispute between two landowners." (Id.) As the district court repeatedly stressed below, this case does not require "any final determination regarding the existence of any R.S. 2477 right-of-way in order to grant [plaintiffs'] requested relief." This is so because "the County ha[d] not filed a quiet title action." The district court properly tailored its relief in light of these principles, prohibiting "those County road signs that conflict with federal land management plans or federal law as identified in this Order." Instead of determining Kane County's property rights vis-à-vis the United States, the district court enjoined similar violations of federal law "unless and until Kane County proves in a court of law that it possesses a right-of-way to any such route."

Astonishingly, the majority both disregards plaintiffs' claims and overlooks the district court's holding. Instead of considering plaintiffs' actual assertion of their legal interests and reviewing the injunction that was entered to vindicate those interests, the majority baselessly insists that plaintiffs "obviously seek[] to enforce the federal government's property rights" and that their "claims turn on the superiority of the federal government's property claim." (Majority Op. 18.) These assertions are peculiar in light

-7-

of the procedural history of this case:  The district court clearly entered a final judgment without determining the validity of any property rights.  Like the panel dissent, the en banc majority chooses to ignore the actual case decided below, and writes as if the plaintiffs were required to establish the superiority of the United States' title to the disputed R.S. 2477 rights-of-way.

**B**

This is not a property-rights case, and the district court properly recognized that the United States' property rights were never placed at issue.  To decide this case, there are only five essential points:

1.  Federal law is "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

2.  The Grand Staircase-Escalante Management Plan, which governs the majority of the area at issue, states:  "Any route not shown on Map 2 is considered closed upon approval of this plan, subject to valid existing rights."  It then clarifies, that "[i]f claims are determined to be valid R.S. 2477 highways, the Approved Plan will respect those as valid existing rights.  <u>Otherwise, the transportation system described in the Approved Plan will be the one administered in the Monument</u>."  Grand Staircase-Escalante National Monument Management Plan 46 & n.1 (emphasis added).[2]  As recounted in the panel

---

[2] In its recounting of the facts of this case, the majority opinion quotes this regulation, but substitutes ellipses for the determinative emphasized sentence.  (Majority Op. 7.)  This omission is glaring.

-8-

majority opinion, the other applicable management plans similarly bar off-highway vehicle use.  See Wilderness Soc'y, 581 F.3d at 1224-26.

   3.  Kane County passed an ordinance and engaged in a signage program opening roads that the applicable federal management plans ordered closed to off-highway vehicles.

   4.  The QTA "is "the exclusive means by which adverse claimants [may] challenge the United States' title to real property."  Block, 461 U.S. at 286 (footnote omitted).

   5.  Kane County concedes that it has not successfully challenged the United States' title to any of the lands at issue in a QTA claim.

None of these steps "turn on the superiority of the federal government's property claim."  (Majority Op. 18.)  Whether Kane County asserts or possesses valid R.S. 2477 rights is irrelevant to the preemption issue at hand.[3]  Instead, as the district court recognized, the dispositive question is whether Kane County has successfully challenged the United States' claim to the lands at issue in a suit under the QTA.  It is undisputed

---

[3] The majority claims that this dissent is driven by skepticism as to the validity of the County's R.S. 2477 claims.  (Majority Op. 21-22.)  This claim is baseless; as clearly stated here and repeatedly emphasized in the panel majority, it simply does not matter whether the County has legitimate claims because it opted not to follow the necessary procedural steps.  See Wilderness Soc'y, 581 F.3d at 1218 n.12 ("[T]he district court went to great lengths to make clear it was not determining the validity of the County's claims to R.S. 2477 rights."); id. at 1219 ("Because a Quiet Title Act claim was not filed in this case, the validity of purported R.S. 2477 rights of way over federal land could not have been adjudicated.") (footnote omitted); id. at 1224 n.22 ("While we acknowledge that R.S. 2477 rights may well have vested without procedural formalities, as did the district court, we do not pass on the validity of such rights." (citation omitted)).

that the County has not done so.  Accordingly, there is no property dispute involved in this case.  It is that simple.

Once the "United States claims an interest" in land, 28 U.S.C. § 2409a(a), there is one way—and only one way—to disturb federal possession:  by bringing a QTA suit. Block, 461 U.S. at 286.  Were this not so, litigants could easily avoid Congress' "carefully crafted provisions of the QTA deemed necessary for the protection of the national public interest."  Id. at 284.  Our court has previously applied the Block rule to bar R.S. 2477 claims unless brought pursuant to the QTA.  Sw. Four Wheel Drive Ass'n v. BLM, 363 F.3d 1069, 1071 (10th Cir. 2004); see also Sw. Four Wheel Drive Ass'n v. BLM, 271 F. Supp. 2d 1308, 1310 (D.N.M. 2003) (district court decision clarifying that the "roads" at issue were claimed R.S. 2477 rights); cf. Kinscherff v. United States, 586 F.2d 159, 161 (10th Cir. 1978) ("Easements are real property interests subject to quiet title actions.").

On the record before us, there is no doubt that the federal government claims an interest in the lands at issue.  Not only did federal agencies institute management plans closing the roads at issue to off-highway vehicle use, federal authorities also posted signs on various claimed rights-of-way prohibiting off-highway vehicle travel.  See Park Cnty. Ass'n v. United States, 626 F.2d 718, 721 (9th Cir. 1980) (posting of "Motor Vehicles Prohibited" sign by federal agency sufficient to claim an interest in alleged right-of-way).[4]  Accordingly, the United States is entitled to possession of that land, and the

---

[4] The majority contends that the government's right to regulate "necessarily entails the discretion of the United States as a property owner."  (Majority Op. 25.)  But it fails

-10-

concomitant regulatory authority that comes with possessory rights, unless and until a claimant brings and wins a QTA claim.  Although there are indeed other means of recognizing R.S. 2477 rights in certain circumstances, see Wilderness Society, 581 F.3d at 1221, there is only one way to challenge title once the United States has claimed an interest in an alleged right-of-way (for example, by posting signs banning off-highway vehicle travel, see Park County Association, 626 F.2d at 721), and that is the QTA.[5]  The majority conflates these distinct concepts in asserting that the QTA "does not, nor could it, purport to be the exclusive means of recognizing R.S. 2477 rights."  (Majority Op. 23.)  When the United States claims an interest in land, as in this case, the QTA can and does provide the exclusive avenue to challenge that claim.

Despite the majority's aspirations to the contrary, there is no R.S. 2477 exception to the Block rule, as the Seventh and District of Columbia Circuits have recognized.  In Shawnee Trail Conservancy v. U.S. Department of Agriculture, 222 F.3d 383 (7th Cir. 2000), plaintiffs alleged that the U.S. Forest Service lacked the authority to designate

---

to acknowledge that the United States exercised its discretion by posting signs closing routes to off-highway vehicle use.

[5] The majority ignores this distinction in asserting that the position of the dissent would be unchanged "even if the government and Kane County agreed about the nature and extent of an R.S. 2477 easement."  (Majority Op. 23.)  Again, this is a mischaracterization.  As the district court stressed, its ruling applies only to signs posted in "conflict with federal land management plans or federal law as identified in [its] Order."  That limited holding was affirmed by the panel majority.  See Wilderness Soc'y, 581 F.3d at 1222 n.19 ("We must decide the [the issue presented] only in the case of a conflict.").  If the United States did not claim an interest in the alleged R.S. 2477 rights, there would be no preempting federal rule upon which to base such a challenge.  Moreover, the QTA applies only if the United States "claims an interest" in land.  28 U.S.C. § 2409a(a).  The majority's hypothetical state of agreement would present an entirely different case.

-11-

certain federal lands as Research Natural Areas based on alleged but unproven rights-of-way. Id. at 385. "Because the plaintiffs did not bring their claim under the QTA," the district court held that it "could not consider the issue of title to the land." Id. at 386 (emphasis added). Affirming that conclusion, the Seventh Circuit held that allowing non-QTA challenges to federal land claims would "allow parties to seek a legal determination of disputed title without being subject to the [QTA] limitations placed on such challenges." Id. at 388. Similarly, in Montanans for Multiple Use v. Barbouletos, 568 F.3d 225 (D.C. Cir. 2009), a group of citizens and organizations attempted to challenge the Forest Service's closure of various roads and trails by claiming that the closures violated the "valid existing rights" language in the Federal Land Management Policy Act, Pub. L. No. 94-579, § 701(h), 90 Stat. 2743. See Montanans for Multiple Use, 568 F.3d at 228. The court quickly recognized that plaintiffs were merely attempting to dodge the QTA: "The upshot is that plaintiffs are necessarily challenging the United States' title to the lands. But such a claim must proceed under the [QTA]." Id. at 229. Because plaintiffs did not invoke the QTA, their argument was rejected. Id.

In line with Shawnee Trail Conservancy and Montanans for Multiple Use, the district court refused to permit Kane County to evade the requirements of the QTA. It noted that Kane County sought to prove up its R.S. 2477 claims, but correctly held that "this case is not the proper forum for such a determination" because "the County has not filed a quiet title action." The majority appears to fault the district court for this unassailable holding. (See Majority Op. 10 ("[The court] declined to allow the County to establish the validity of its R.S. 2477 rights before deciding the merits.").) Although the

-12-

majority attempts to back away from its primary holding by claiming that it does not violate Block, (Majority Op. 23-24), the majority is openly hostile to the unassailable conclusion that Kane County cannot challenge the United States' claim to public lands outside of a QTA claim and that "absent participation and victory in that quiet title action, the R.S. 2477 claimant loses." (Majority Op. 22.) To the contrary, the majority holds, there are "several other mechanisms for resolving such disputes." (Id.) This holding is in direct contravention of Block, which unambiguously holds that the QTA is "the exclusive means by which adverse claimants [may] challenge the United States' title to real property." 461 U.S. at 286 (footnote omitted, emphasis added).

Despite the majority's claim that plaintiffs' case rests on the disputed third party property rights of the United States and "seeks to vindicate the property rights of the federal government," (Majority Op. 4), those rights needed no vindication; they were never put in doubt. Kane County elected not to file a QTA claim against the United States as required to meet its burden of proving any R.S. 2477 rights. Consequently under United States Supreme Court precedent, Block, 461 U.S. at 286—reaffirmed by multiple circuits—Kane County never viably challenged the United States' interests in the lands at issue. See S. Utah Wilderness Alliance v. BLM, 425 F.3d 735, 768-69 (10th Cir. 2005) (holding that parties seeking to enforce rights-of-way against the federal government, including R.S. 2477 rights, bear the burden of proving those claims. If there are any doubts, "they are resolved for the Government, not against it." (quoting Watt v. W. Nuclear, Inc., 462 U.S. 36, 59 (1983))).

But today's majority decision holds that the United States' property rights were at issue despite this fundamental defect and that this case must be dismissed on prudential standing grounds. To reach its conclusion, the majority necessarily has held the United States may be stripped of its property rights outside a QTA claim, and thereby creates a circuit split with <u>Shawnee Trail Conservancy</u> and <u>Montanans for Multiple Use</u>.

## C

Further compounding its error, the majority fails to recognize that the Property Clause of the United States Constitution, art. IV, § 3, cl. 2, undermines its analysis. The majority attempts to recast this case as one based on disputed property rights to justify its conclusion that the plaintiffs are claiming rights that actually belong to the United States. To support this judicial artifice, the majority apparently assumes that the federal government lacks authority to ban off-highway vehicle use through protected federal lands if Kane County's alleged R.S. 2477 rights are valid. Under the majority's construction, if the United States has title, then Kane County's regulation is preempted and plaintiffs prevail; if title belongs to Kane County, plaintiffs' preemption argument fails and they lose. Either way, asserts the majority, plaintiffs' claims "turn on the superiority of the federal government's property claim." (Majority Op. 18.) But the majority's argument rests on a false dichotomy: Putting aside the QTA issue, even validly adjudicated R.S. 2477 rights-of-way are not free from federal regulation. The property dispute, even if it were resolved, cannot be dispositive.

As our court held in <u>United States v. Jenks</u>, 22 F.3d 1513, 1517-18 (10th Cir. 1994), easements over federal land remain subject to reasonable federal regulation. <u>See</u>

-14-

also S. Utah Wilderness Alliance, 425 F.3d at 746-48 (recognizing R.S. 2477 rights-of-way as easements subject to federal regulation). Citing Kleppe v. New Mexico, 426 U.S. 529 (1976), the Sixth Circuit has held that the Property Clause is "sufficiently broad to authorize Congressional regulation of private-property interests that are also located on public land," including "private property rights in easements over the public land." Burlison v. United States, 533 F.3d 419, 432-33 (6th Cir. 2008). The Ninth Circuit has repeatedly upheld the federal government's authority to regulate R.S. 2477 rights-of-way that traverse protected federal lands. See Clouser v. Espy, 42 F.3d 1522, 1538 (9th Cir. 1994); United States v. Vogler, 859 F.2d 638, 642 (9th Cir. 1988). The same is true of district courts in our own circuit. See United States v. Garfield Cnty., 122 F. Supp. 2d 1201, 1240-41 (D. Utah 2000); Wilkenson v. Dep't of Interior, 634 F. Supp. 1265, 1280 (D. Colo. 1986).

The fact that the United States may regulate even valid rights-of-way further undermines the majority's recasting of this case as one based on disputed property rights. Even if Kane County had successfully established the validity of its claimed rights-of-way by bringing a QTA action, the preemption issue would remain. The notion that the outcome of this case turned on a credible property-rights claim is quite clearly mistaken.

**III**

Having radically reconstructed plaintiffs' case, the majority holds that a defendant whose preempted action injures another may rob plaintiffs of prudential standing simply by challenging the United States' authority to regulate. But in ruling that the plaintiffs'

claims rest on the "rights" of a third party, the majority misunderstands the doctrine of prudential standing as well.

The branch of prudential standing misapplied by the majority was first discussed by the Supreme Court in Warth v. Seldin, 422 U.S. 490 (1975).  In that case, certain residents of Rochester, New York, and an organization representing their interests filed suit under 42 U.S.C. § 1983, alleging that a nearby suburb, Penfield, effectively excluded low- and moderate-income residents through its zoning code.  Id. at 493-94.  One group of plaintiffs alleged that this zoning scheme caused them to pay higher taxes because the low-income residents were forced to live in Rochester.  Id. at 508-09.  The Court noted that a "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  Id. at 499.  It further explained that "[e]ssentially, the standing question in such cases is whether the constitutional or statutory provision on which the claim rests properly can be understood as granting persons in the plaintiff's position a right to judicial relief."  Id. at 500 (footnote omitted).  As applied to the taxpayer-plaintiffs, the Court ruled that they were merely alleging "that Penfield's zoning ordinance and practices violate the constitutional and statutory rights of third parties, namely, persons of low and moderate income who are said to be excluded from Penfield."  Id. at 509.  Because no statute "grant[ed] a right of action, and thus standing to seek relief, to persons in petitioners' position," the Court dismissed their claims.  Id. at 510.

Warth is best understood as holding that § 1983 does not provide a private right of action to remedy violations of the constitutional rights of others.  Grappling with a

-16-

nascent doctrine, the Court articulated the lack of a "right of action" as a "standing" issue. 422 U.S. at 510. However, the Court has clarified in the years following <u>Warth</u> that the existence of a cause of action (sometimes called "statutory standing") must not be confused with jurisdictional matters. <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 95-97 (1998); <u>see also</u> <u>Dohaish v. Tooley</u>, 670 F.2d 934, 936-37 (10th Cir. 1982) ("It is not unusual for standing and the cause of action based on violation of civil rights to be confused.").

Unlike the plaintiffs in <u>Warth</u>, the plaintiffs at bar "have a valid right of action under the Supremacy Clause." <u>Chamber of Commerce of the U.S. v. Edmondson</u>, 594 F.3d 742, 756 n.13 (10th Cir. 2010); <u>see also</u> <u>Qwest Corp. v. City of Santa Fe</u>, 380 F.3d 1258, 1266 (10th Cir. 2004) ("A party may bring a claim under the Supremacy Clause that a local enactment is preempted even if the federal law at issue does not create a private right of action."). The Supreme Court recently reaffirmed the principle that citizens possess "an implied private right of action directly under the Constitution to challenge governmental action," noting that "equitable relief has long been recognized as the proper means for preventing entities from acting unconstitutionally." <u>Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.</u>, 130 S. Ct. 3138, 3151 n.2 (2010) (quotation omitted).

The cases cited in <u>Warth</u> as creating the third party prudential standing rule clarify how the rule was intended to operate. In <u>Barrows v. Jackson</u>, 346 U.S. 249 (1953), the Court held that "one may not claim standing in this Court to vindicate the constitutional rights of some third party," explaining that the basis for the rule is that a "person cannot

-17-

challenge the constitutionality of a statute unless he shows that he himself is injured by its operation." Id. at 255. Similarly, in Tileston v. Ullman, 318 U.S. 44 (1943), the Court rejected a doctor's attempt to challenge a contraceptives law because he lacked "standing to secure an adjudication of his patients' constitutional right to life, which they do not assert in their own behalf." Id. at 46.

These cases stand for the uncontroversial proposition that one may not sue based on violations of a third party's rights or legal interests. Although the "rights" language worked well enough in Warth given that it was a § 1983 claim (and thus dependent upon a deprivation of rights), the prudential standing limitation is based on a party's inability to bring claims that actually belong to a third party. That understanding is confirmed by Sprint Communications Co. v. APCC Services, 554 U.S. 269 (2008), which discussed "certain prudential limitations that we have imposed in prior cases where a plaintiff has sought to assert the legal claims of third parties." Id. at 289 (emphasis added); see also Dennis v. Higgins, 498 U.S. 439, 447 n.7 (1991) (defining "right" as a "legally enforceable claim of one person against another, that the other shall do a given act, or shall not do a given act" (quotation omitted, emphasis added)).

In Warth, plaintiffs were seeking to bring a claim that properly belonged to the individuals whose rights were violated. 422 U.S. 509-10. In Tileston, the Court rejected a doctor's due process claim because the patients whose lives were endangered were the proper litigants. 318 U.S. at 46. In Barrows, the question was whether white homeowners could rely on the violation of the rights of potential non-white buyers in a racial covenant case. 346 U.S. at 254-55. Other cases cited by the majority confirm the

-18-

claim-focused nature of the prudential standing limitation.  See Elk Grove Unified Sch. Dist. v. Newdow, 542 U.S. 1, 17 (2004) (father's claim challenging school recitation of Pledge of Allegiance belonged to daughter or parents acting in concert); Singleton v. Wulff, 428 U.S. 106, 113-15 (1976) (partial plurality opinion) (considering whether doctor's challenge to ban on abortion funding belonged to patients).

Although the Court has admittedly used the terms "rights," "interests," and "claims" in a seemingly interchangeable manner in the context of § 1983 claims, there exists a firmly rooted analytical distinction between causes of action based on the violation of individual rights under § 1983 and those that arise directly under the Constitution based on the structure of government.  See White Mountain Apache Tribe v. Williams, 810 F.2d 844, 849 (9th Cir. 1987).  As a framer of § 1983 noted,

> prohibitions upon the political powers of the States are of such a nature that they can be . . . enforced by the courts of the United States declaring void all State acts of encroachment on Federal Powers. . . .  But there are some that are not of this class.  These are where the court secures the rights or liabilities of persons within the States, as between such persons and the States.

White Mountain Apache Tribe, 810 F.2d at 849 (quoting Cong. Globe, 42d Cong., 1st Sess., App. 69 (1871) (statement of Representative Shellabarger)).  One may shift between the terms "rights" and "claims" when the plaintiff's claims assert the violation of an individual right, but one may not sensibly describe the plaintiffs here as asserting the "rights" of the United States against an exertion of power by Kane County.  In accurate terms, the plaintiffs are seeking to halt "State acts of encroachment on Federal Powers," id., as are all preemption claimants.

-19-

The third party prudential standing limitation is designed to ensure plaintiffs are suing because they themselves have been injured and possess a right of action. Plaintiffs in this case meet these requirements. They properly pled the type of recreational and aesthetic injuries repeatedly recognized by the Supreme Court as sufficient for Article III standing. See Summers v. Earth Island Inst., 129 S. Ct. 1142, 1149 (2009) ("While generalized harm to the forest or the environment will not alone support standing, if that harm in fact affects the recreational or even the mere esthetic interests of the plaintiff, that will suffice." (citation omitted)). Moreover, plaintiffs possess a right of action to remedy these injuries because a "party may bring a claim under the Supremacy Clause that a local enactment is preempted," Qwest, 380 F.3d at 1266; see Chamber of Commerce, 594 F.3d at 756 n.13; see also Free Enter. Fund, 130 S. Ct. at 3151 n.2.

The majority's description of the United States' authority to promulgate regulations as a "right" is unusual. Defendants often assert that a preemptive federal enactment is somehow invalid in response to a preemption claim. See, e.g., Lindsey v. Tacoma-Pierce Cnty. Health Dep't, 195 F.3d 1065, 1075 (9th Cir. 1999) (local government body argues federal statute exceeds Congress' power under the Commerce Clause in response to preemption claim). Mere assertion of such a defense does not demand dismissal.[6] If it did, the Supremacy Clause would be a dead letter: Every preemption claim rests on the authority of the United States. But prudential standing

---

[6] The majority claims that permitting plaintiffs to assert their claim would "force a quiet title action." (Majority Op. 22.) To the contrary, it is Kane County's affirmative defense that the United States lacks title to the property over which it prohibited off-highway vehicle use that required a QTA suit.

-20-

does not vitiate the Supremacy Clause; it simply demands that plaintiffs seek redress for their own injuries under their own causes of action.

Contrary to the majority's assertion, neither plaintiffs' injury nor their right to sue under the Supremacy Clause belongs to the United States. As for the injury to plaintiffs' aesthetic and recreational interests, the majority does not suggest that the United States actually suffered this injury. Rather, the majority simply discounts their injuries because they are "indistinguishable from TWS's argument for constitutional standing." (Majority Op. 17.) But a party's injuries for constitutional and prudential standing will always align, and, as the analysis in Warth indicates, the two are often difficult to disaggregate. See 422 U.S. at 499-500 (describing prudential standing as "closely related to Article III concerns"); see also Duke Power Co. v. Carolina Envtl. Study Grp., 438 U.S. 59, 80-81 (1978) ("Where a party champions his own rights, and where the injury alleged is a concrete and particularized one which will be prevented or redressed by the relief requested, the basic practical and prudential concerns underlying the standing doctrine are generally satisfied when the constitutional requisites are met."). There is not a heightened injury requirement in the prudential standing analysis; the majority prohibits plaintiffs from obtaining relief for their injuries based on its conclusion that their claim should have been brought by the United States. Yet a government cannot suffer an aesthetic or recreational injury in its own right, even if it may seek to protect those interests on behalf of its citizens.

Nor does the plaintiffs' cause of action belong to the United States. Plaintiffs "have a valid right of action under the Supremacy Clause." Chamber of Commerce, 594

F.3d at 756 n.13; see also Qwest, 380 F.3d at 1266. This is a right that plaintiffs possess as parties injured by the operation of a preempted local ordinance. It is not based on a generalized grievance "shared in substantially equal measure by all or a large class of citizens," Warth, 422 U.S. at 499; it is one enjoyed by the relatively small number of individuals who have been injured by Kane County's preempted activities. The United States may also possess standing to bring a preemption claim against Kane County. See United States v. Colo. Supreme Court, 87 F.3d 1161, 1165 (10th Cir. 1996) (United States has standing to bring preemption claim if it demonstrates actual injury). However, that right of action would seek relief for different injuries to a different party. The fact that more than one party possesses standing to bring a Supremacy Clause challenge does not rob any of those parties of the right to sue. See Pub. Citizen v. U.S. Dep't of Justice, 491 U.S. 440, 449-50 (1989) ("The fact that other citizens or groups of citizens might make the same complaint . . . does not lessen [the] asserted injury.").

According to the majority, "other governmental institutions may be more competent to address the questions" presented by this case. (Majority Op. 12-13 (quoting Warth, 422 U.S. at 500).) Yet again, the majority blithely ignores the legal framework established by Congress. If the majority is referring to property-rights issues—which were never in play, see Part II, supra—only federal courts may decide a QTA claim. 28 U.S.C. § 1346(f) ("The district courts shall have exclusive original jurisdiction of civil actions under section 2409a to quiet title to an estate or interest in real property in which an interest is claimed by the United States."). Congress has prohibited federal agencies from issuing final determinations of R.S. 2477 claims. See Omnibus Consolidated

-22-

Appropriations Act, 1997, Pub. L. No. 104-208, § 108, 110 Stat. 3009, 3009-200 (1996) ("No final rule or regulation of any agency of the Federal Government pertaining to the recognition, management, or validity of a right-of-way pursuant to Revised Statute 2477 (43 U.S.C. 932) shall take effect unless expressly authorized by an Act of Congress subsequent to the date of enactment of this Act.").

Despite its claim that the political branches may be better suited to resolve this case, the majority finds it appropriate to speak for the BLM. It declares that the agency "does not wish to assert its rights against Kane County at this time or in this fashion." (Majority Op. 19.) Yet again, the majority ignores the background of this case. The BLM objected to Kane County's actions before this suit was filed. It was also briefly a party to this case below, and was thus clearly aware of the issues involved. But the agency did nothing after the district court entered its injunction or after the panel majority affirmed the district court. The majority interprets this silence as a clear denunciation of plaintiffs' claims, but if the BLM opposes the injunction that was entered by the district court and affirmed on appeal—as the majority divines—it has chosen a strange way to express its disagreement. The BLM's silence is just as easily interpreted as acquiescence to the plaintiffs' actions than as opposition to them.

The majority confuses the rights and interests at issue in this case. To the extent that the United States has any "right" related to this dispute, it would be its authority to regulate. All preemption claims rest on that authority. The majority opinion poses a real threat to the availability of relief for those injured by unconstitutional state action. This court received numerous briefs from amici with diverse interests urging us not to strip

-23-

away the longstanding ability of plaintiffs to seek relief from unconstitutional state regulation under the Supremacy Clause. Although the majority does not do so in explicit terms, it holds that a mere challenge to federal authority—no matter how frivolous—is sufficient to destroy such plaintiffs' right of action.[7]

## IV

The concurrence in judgment would also vacate the district court's injunction, but would do so on somewhat different bases. (Concurring Op. 1.) It would hold that much of plaintiffs' challenge has become moot, (id. at 1), and that plaintiffs lack standing over the remainder because their injuries are not redressable, (id. at 5). I wish to briefly address the concurrence's reasoning.

## A

With respect to mootness, the concurrence mistakenly concludes that there is no evidence that Kane County will resume its unlawful activity. (See Concurring Op. 3-4.) The record reveals substantial evidence of such intent. First, the minutes of the meeting at which the County rescinded the ordinance state that the action was taken "in order to secure the most successful legal resolution to current federal roads litigation." This is

---

[7] This proposition is especially dangerous given the ubiquity and ostensible lack of merit to many R.S. 2477 claims. See, e.g., Hale v. Norton, 476 F.3d 694, 696 (9th Cir. 2007) (claimed R.S. 2477 right-of-way had been abandoned since 1938, "[a]ll of its bridges have washed away, and the effects of vegetation and erosion have reduced it to little more than a trail"); Sarah Krakoff, Constitutional Conflicts on Public Lands: Settling the Wilderness, 75 U. Colo. L. Rev. 1159, 1177-78 (2004) ("Some of Moffatt County's asserted claims run along river bottoms and traverse jagged rocky outcroppings. Similarly, Utah counties have asserted thousands of R.S. 2477 claims, many of which challenge even the most generous definition of 'highway' and some of which—such as slot canyons and slick-rock domes—audaciously mock the term." (footnotes omitted)).

-24-

precisely the type of strategic manipulation of district court jurisdiction the voluntary cessation doctrine is intended to preclude. See City News & Novelty, Inc. v. City of Waukesha, 531 U.S. 278, 284 n.1 (2001) (the voluntary cessation doctrine "traces to the principle that a party should not be able to evade judicial review, or to defeat a judgment, by temporarily altering questionable behavior").

Second, a County press release announcing the rescission stated that the decision was made because litigating the ordinance simultaneously with the ownership of the roads "is too big a bite of the apple at one time." (Emphasis added.) A County Commissioner similarly testified that it was not his "intention to reenact [another ordinance] right away." (Emphasis added.) The Commissioner stated that the County had a "full plate" between "litigation on roads and grazing and public land planning issues." When asked whether he continued to believe the County possessed authority to allow off-highway vehicles on roads lying within federal land (at a time when the County had not prevailed in any QTA action), the Commissioner answered, "Yes." These statements belie the benign intent attributed to Kane County by the concurrence, which suggests the County intended to place signs and enact another ordinance only after a determination of its R.S. 2477 claims. (See Concurring Op. 3-4.)

Third, even after the ordinance was rescinded, Kane County refused to remove many of its signs from disputed routes. When asked whether those remaining signs signified a right-of-way open to vehicles, a County Commissioner testified that the signs "identify a road as a county road, which by definition is a public highway, which would

therefore be open to public travel."[8]  Up until the very moment the district court entered

its injunction, Kane County persisted in its unlawful actions.  See Wilderness Soc'y v.

Kane County, 560 F. Supp. 2d 1147, 1156 (D. Utah 2008).  This course of action

demonstrates "reluctant submission by governmental actors and a desire to return to the

old ways."  See Rio Grande Silvery Minnow v. Bureau of Reclamation, 601 F.3d 1096,

1117 (10th Cir. 2010) (quotation and alteration omitted).

This brings me to my second disagreement with the concurrence's mootness

analysis.  Despite its claim that four years have passed since the ordinance was repealed,

the relevant time period is much shorter because Kane County was enjoined from passing

a similar ordinance during most of the timeframe cited.  Compliance with an injunction

during the pendency of an appeal obviously does not render the appeal moot.  See Bell v.

Wolfish, 441 U.S. 520, 542 n.25 (1979); cf. NLRB v. King Soopers, Inc., 476 F.3d 843,

845-46 (10th Cir. 2007).  If it did, we would lack the power to review injunctions entered

by the district courts absent non-compliance by the appellant.

In the context of rescinded statutes our circuit precedent holds that a case is not

moot unless "it can be said with assurance that there is no reasonable expectation that the

alleged violation will recur."  Rio Grande Silvery Minnow, 601 F.3d at 1115.  The

foregoing facts demonstrate this standard has not been met, especially in light of the fact

---

[8] The concurrence attempts to conceptually sever the operation of the Ordinance and the posting of road signs by ignoring this testimony.  But the posting of county road signs indicates that the routes are open to public travel.  Both the ordinance and the signs concern Class B and Class D roads, the latter of which "provide for usage by the public for vehicles with four or more wheels."  See Utah Code §§ 72-3-103, -105.

that Kane County persisted in the challenged actions until the threat of contempt forced it to halt.

**B**

As to its standing analysis, the concurrence acknowledges that the posting of Kane County signs on federal lands remains a live dispute, but would hold that plaintiffs lack standing to challenge the County's signage program because the injury is not redressable under the Supremacy Clause. (Concurring Op. 6-10.) This analysis suffers two flaws.

First, the concurrence makes the unfortunate error of conflating standing and the merits. See Utah Animal Rights Coal. v. Salt Lake City Corp., 371 F.3d 1248, 1256 (10th Cir. 2004) ("[W]e must not confuse standing with the merits."). According to the concurrence, plaintiffs' injuries are not redressable because the County's signage program proceeds under federal law and thus there are no "County laws or actions inconsistent with federal law" to be enjoined under the Supremacy Clause. (Concurring Op. 7.) But this is simply an assertion that the plaintiffs' Supremacy Clause claim fails on the merits. "For purposes of standing, the question cannot be whether the Constitution, properly interpreted, extends protection to the plaintiff's asserted right or interest. If that were the test, every losing claim would be dismissed for want of standing." Initiative & Referendum Inst. v. Walker, 450 F.3d 1082, 1092 (10th Cir. 2006).

The redressability analysis does not ask whether plaintiffs can obtain the relief they request under their theory of the case, as the concurrence would have it. Instead, the questions is simply whether "it is likely and not merely speculative that the plaintiff's

injury will be remedied by the relief plaintiff seeks in bringing suit." Sprint Commc'ns Co., L.P., 554 U.S. at 273-74 (quotations omitted); see also Initiative & Referendum Inst., 450 F.3d at 1098 ("[R]edressability [is] the requirement that a favorable judgment would meaningfully redress the alleged injury.").

Plaintiffs have established redressability under the proper standard. The injunction they sought, and fleetingly obtained, was likely to at least somewhat redress the injuries alleged to plaintiffs' aesthetic and recreational interests. See Larson v. Valente, 456 U.S. 228, 243, n.15 (1982) ("[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury."). Contrary to the hypothetical injunction to which the concurrence references, (Concurring Op. 10), plaintiffs sought "an injunction ordering Kane County to remove its County signs from federal public lands." And the actual injunction plaintiffs obtained below required Kane County to "remove those signs indicating as open those routes closed under federal land management plan[s] or federal law." Wilderness Soc'y, 560 F. Supp. 2d at 1166. In conducting the redressability inquiry, we ask only whether the "relief plaintiff seeks" would redress the injury. Sprint Commc'ns Co., L.P., 554 U.S. at 273-74 (quotations omitted). Whether the concurrence would grant the relief requested is utterly irrelevant to the redressability analysis.

In the same breath that it criticizes the district court's ruling and indicates its contrary view on the merits of plaintiffs' Supremacy Clause challenge, the concurrence asserts that the dissent fails to identify "any merits question I decide against the

[plaintiffs]." (Concurring Op. 11 n.3.) But of course, the concurrence would decide that plaintiffs' Supremacy Clause challenge fails on the merits—it would deny plaintiffs the relief they request. The concurrence fleetingly recognizes that "whether a favorable judgment on the plaintiff's cause of action asserted would redress the plaintiff's claimed injuries" is the proper analysis, (id.), but adopts a curious definition of "favorable judgment." In its view, a favorable judgment is not the requested injunction, but rather whatever relief is available in light of the concurrence's view of the merits. But the Supreme Court has been abundantly clear that the "relief plaintiff seeks," Sprint Commc'ns Co., L.P., 554 U.S. at 273-74, is the locus of the redressability analysis; not the relief a judge might deem appropriate.

The second problem with the concurrence's standing analysis is its assertion that Kane County's signage program constitutes enforcement of federal law. (Concurring Op. 8.) R.S. 2477 is merely a federal land grant, see S. Utah Wilderness Alliance, 425 F.3d at 769; it did not deputize counties into the federal law enforcement apparatus. Regulation of an asserted county highway does not constitute enforcement of federal law merely because title was allegedly granted by a federal statute. We would not suggest, for example, that a local school was somehow enforcing federal law simply because it was built on a parcel provided for by a federal land grant. Cf. Dist. 22 UMW of Am. v. Utah, 229 F.3d 982, 988 (10th Cir. 2000) (discussing federal land grants for schools).

Moreover, the ordinance itself explicitly noted that Kane County claims authority to designate roads pursuant to state law, specifically Utah Code §§ 41-22-10.1 and 10.5, which allow Utah Counties to designate roadways by posting signs. And, as noted above,

-29-

even after the ordinance was rescinded, the County continued to claim that its signs opened rights of way to the public. The provisions of the Utah Code make clear the County's authority to regulate the Class B and D roads at issue. See Utah Code §§ 72-3-103, -105. Kane County officials were not enforcing any provisions of federal law, nor was the County acting as a private landowner might. (See Concurring Op. 9.) Instead, it was utilizing its authority under Utah state law to open roads despite conflicting federal management plans. Such action can, and should, be proscribed by way of a Supremacy clause challenge. But this disagreement goes to the merits of plaintiffs' claims, not to their standing. And because Kane County never advanced this argument, it is not before the en banc court in any event.

## V

Today's decision will work untold mischief. Operating under the district court's injunction, Kane County and the United States have begun the orderly process of determining the validity of R.S. 2477 rights in the only manner permissible under federal law—through the QTA. See Kane Cnty. v. United States, 597 F.3d 1129, 1130 (10th Cir. 2010) (discussing QTA case filed by Kane County in 2008). But because the majority holds that the United States' claim to land may be imperiled outside the QTA context, and effectively reverses the presumption of federal authority over federal lands, Kane County now has no reason to continue down this road. The majority grants it, and every other state and local government in the circuit—which for these purposes regrettably includes Yellowstone National Park, all of which lies within our jurisdiction—a green light to flout federal law. Although this sort of lawlessness may play well in a wild-west

-30-

style fantasy, the majority's decision causes real and serious harm to the litigants, to the United States, and to the responsible residents of the affected communities seeking a resolution to this apparently interminable dispute.